**SIGNED this 6th day of April, 2012**

_Shelley D. Rucker_

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

In re:

RAYMOND SHERMAN HANSEN, and             No. 10-13181
DEBORAH SLAUGHTER HANSEN                 Chapter 13
      Debtors;

FIRST TENNESSEE BANK NATIONAL
ASSOCIATION,
      Plaintiff,

v.                                       Adversary Proceeding
                                         No. 10-1466

RAYMOND SHERMAN HANSEN, and
DEBORAH SLAUGHTER HANSEN
      Defendants.

## MEMORANDUM

The plaintiff First Tennessee Bank National Association ("Plaintiff" or the "Bank")

brings this adversary proceeding against Raymond Sherman Hansen and Deborah Slaughter

Hansen ("Defendants" or "Debtors"). This case involves the damages to the Debtors' residence which served as the Bank's collateral.  There is no dispute that these damages which were significant were caused by Daniel Hixon who operated a methamphetamine lab in a storage room in the basement of the residence. Mr. Hixon, the father of the Debtors' young grandson, had been invited to live in the basement apartment of the residence with his son after the death of the child's mother.

The Bank asserts a claim of dismissal for cause pursuant to 11 U.S.C. § 1307(c) on the basis that the Debtors hid the damages until they could surrender the residence in their Chapter 13 plan. It also seeks a determination that the damages were the result of willful and malicious injury by the Debtors and are nondischargeable pursuant to 11 U.S.C. § 523(a)(6). It further seeks a declaration that the damages to the residence are post-petition debts that are not discharged by completion of the plan.  In order to determine the merits of these claims, the court must consider when the damages occurred; whether the Debtors knew of the operation of the lab and its risks to the residence; and if they knew, whether they knowingly hid those damages from the Bank.

The Debtors have brought a counterclaim for conversion and willful destruction of the personal property against the Bank. *See* [Doc. No. 32-1, Amended Answer and Counterclaim]. The Bank was required to remediate the residence in order to conduct a foreclosure sale. In the course of the remediation, some of the Debtors' personal property left in the house was destroyed.

A trial was held in this proceeding on March 14, 2012. The court heard testimony and reviewed evidence presented by the parties. It has further reviewed the briefing filed by the

parties, the pleadings at issue, and the applicable law.  It concludes that:  (1) the plan was not

filed in bad faith nor was the confirmation obtained by fraud; (2) the damages to the residence,

while substantial, are not the result of willful and malicious injury by the Debtors; and (3) the

damages sustained by the Bank are pre-petition debts which may be satisfied through the Plan.

With respect to the counterclaim, the Debtors have not demonstrated the value of their property

after contamination or that their loss was caused by the Bank for their claim of conversion;

therefore, this claim will be denied. The court makes the following findings of fact and

conclusions of law in support of its ruling pursuant to Fed. R. Bankr. P. 7052.

## I.      Background

## A.      The Bank's Claims

The Debtors executed and delivered to the Bank a balloon note in the original "principal

amount of $476,012.00" in 2006. Trial Ex. 1.  The note was secured by the Debtors' residence, a

custom built home located at 1007 E. Dallas Road, Chattanooga, Tennessee.  *Id.* at ¶ 5.  The

security interest was evidenced by a deed of trust. Trial Ex. 2.

The Debtors filed their Chapter 13 voluntary bankruptcy petition on June 1, 2010.  The

Debtor's original Chapter 13 plan proposed to pay the Bank $3215 per month in maintenance

payments and monthly payments of $70 to be paid towards arrearage estimated by the Bank.

Trial Ex. 3.  The court never confirmed the Debtors' first plan, and the Debtors filed an amended

Chapter 13 plan on July 27, 2010. Trial Ex. 5. After the Bank filed its secured Proof of Claim in

the amount of $463,183.96 on August 18, 2010 (Trial Ex. 4) and the Debtors received an

appraisal of $475,000 on August 25, 2010 (Trial Ex. A), the Debtors submitted a second

amended Chapter 13 plan on September 27, 2010. Trial Ex. 6. In this plan the Debtors proposed

3

to surrender the residence, and they provided that the deficiency claim would be treated as an

unsecured claim. Trial Ex. 6. The Bank filed a motion for relief from the automatic stay on

October 5, 2010. [Bankr. Case No. 10-13181, Doc. No. 24]. The Bank did not allege any value

for the house. *See id.* The 341 meeting on the September 27, 2010 plan was held on October 13,

2010. *See* [Bankr. Case No. 10-13181, Doc. Nos. 22, 26]. The Bank did not object to this

treatment of the residence, and this court confirmed the amended plan on October 17, 2010. *See*

[Bankr. Case No. 10-13181, Doc. No. 27].

The record contains no evidence that the Debtors represented anything about the value or

condition of the house other than the value listed in their schedules.  The court granted the

Bank's motion for relief from the automatic stay on November 3, 2010 on passive notice due to

the fact that the Debtor did not object to the motion and the Bank did not withdraw its motion.

[Bankr. Case No. 10-13181, Doc. Nos. 24, 29].  As of the filing of the Complaint in this

proceeding, the Bank had not initiated foreclosure or eviction proceedings.  The foreclosure has

now been set for April 5, 2012.

The Debtors, their 19-year-old son, their 7-year-old grandson, Nalin, and the grandson's

father, Daniel Hixon, lived in the residence.  Trial Testimony of Raymond Hansen ("R. Hansen

Test."), March 14, 2012 at 1:36 p.m.; 1:42 p.m. Mr. Hixon and his son occupied the bottom floor

which contained an apartment and a cinderblock storage room which the Debtors refer to as the

"under garage". *Id.* D. Hansen Test., March 14, 2012 at 3:13-3:14 p.m.; Hixon Test., March 14,

2012 at 12:05-12:07 p.m. The apartment had a separate entrance and an internal stairway that led

to the main level where the Debtors and their teenage son lived.  The stairway could be locked,

4

but Mr. Hansen could access the basement when he "needed to" do so. R. Hansen Test., March 14, 2012 at 1:37 p.m.

The Debtors' daughter suffered from drug abuse problems that led her to take her own life in 2008. R. Hansen Test., March 14, 2012 at 1:36-1:37 p.m. Mr. Hixon also suffered from abuse problems and had been convicted and served time for theft and aggravated assault. *Id.* R. Hansen Test., March 14, 2012 at 2:15-2:16 p.m. Trial Testimony of Daniel Hixon, deposition testimony submitted and read into record at trial ("Hixon Test."), March 14, 2012 at 12:04 p.m. Upon his release in 2008, he lived with his parents, obtained employment, took regular drug tests and developed a loving relationship with his son, as testified to by the Debtors. R. Hansen Test., March 14, 2012 at 2:16-2:17 p.m.; Trial Testimony of Debbie Hansen ("D. Hansen Test."), March 14, 2012 at 3:01-3:02 p.m. In May of 2009, after 10 months of what appeared to be exemplary behavior, the Debtors who had had temporary custody of Nalin during Mr. Hixon's incarceration and subsequent release, invited Mr. Hixon to move into the apartment. R. Hansen Test., March 14, 2012 at 1:38 p.m.; 2:15-2:16; D. Hansen Test., March 14, 2012 at 3:01-3:03 p.m. Mr. Hixon, who had been sleeping on the couch at his parents' home, and seeing his son only on weekends, accepted their offer and moved into the Debtors' home. *Id.* Hixon Test., March 14, 2012 at 12:05 p.m. He helped with yard work and repairs, and continued with his probation. D. Hansen Test., March 14, 2012 at 2:15-2:17 p.m.; Hixon Test., March 14, 2012 at 12:01-12:02 p.m.

The fortunes of the entire family took a turn for the worse in 2010. Mr. Hansen's advertising business continued to suffer from a slow economy and the loss of clients. R. Hansen Test., March 14, 2012 at 1:39 p.m. Mr. Hixon lost his job. D. Hansen Test., March 14, 2012 at

3:23 p.m.; Hixon Test., March 14, 2012 at 12:01 p.m. In the summer of 2010, the Debtors filed

for bankruptcy relief, anticipating that a Chapter 13 would give them time to sell their home and

use the equity to pay off the plan. R. Hansen Test., March 14, 2012 at 1:39 p.m.

In August of 2010, the home was appraised for $475,000.  *See* Trial Ex. A. The appraiser

conducted a thorough inspection of the home, both inside and out, taking measurements in each

room including the basement apartment. She found the home to be in good condition.  Trial

Testimony of Karey Haisten-Matlock, March 14, 2012 at 2:54-2:55 p.m. At trial she testified that

she had not detected any strange odors in her inspection and that she would be "very shocked" to

learn that a methamphetamine laboratory was located in the house. *Id.* at 2:55 p.m.

During that same period of time, in the summer of 2010, the Debtors had decided to build

a more formal entrance to the apartment and were in the process of constructing a new wall

adjacent to the "under garage" for that purpose.  D. Hansen Test., March 14, 2012 at 3:13 p.m.

The Debtors had contracted for carpentry work, the installment of sheet rock, and painting. *Id.*

Hixon Test., March 14, 2012 at 12:08 p.m.

The Debtors had expected the appraisal to be substantially higher.  Deciding that they had

no equity in the house, they changed their plan in order to surrender the house and filed a second

amended plan on September 27, 2010.  Trial Ex. 6; R. Hansen Test., March 14, 2012 at 1:42 p.m.

The Debtors began moving out in early October.  On October 13, 2010 they attended the meeting

of creditors.  *See* [Bankr. Case No. 10-13181, Doc. Entry No. 26]; R. Hansen Test., March 14,

2012 at 2:14-2:15 p.m. The Bank did not object. *Id.* Since there were no objections, the second

amended plan was confirmed without further hearing.

On Saturday, October 16, 2010, Mr. Hansen asked his grandson to go to the "under garage" to get some tape to use for packing boxes. D. Hansen Test., March 14, 2012 at 3:07 p.m.; R. Hansen Test., March 14, 2012 at 1:44 p.m. Nalin said his father would not allow him to go into the "under garage" room because of the fumes. D. Hansen Test., March 14, 2012 at 3:07 p.m.; Hixon Test., March 14, 2012 at 11:57 a.m. When Mr. Hansen asked about the fumes, Nalin said his father had been painting. D. Hansen Test., March 14, 2012 at 3:07 p.m.

Mr. Hansen then went to the "under garage" room to get the tape and upon entry into the room, found two bottles and a tube. R. Hansen Test., March 14, 2012 at 2:20-2:21 p.m.; D. Hansen Test., March 14, 2012 at 3:08 p.m.; Hixon Test., March 14, 2012 at 11:57 a.m. He returned upstairs to tell his wife what he had found. The Debtors then made arrangements for Nalin to be taken to stay with his aunts and returned with Mr. Hixon's parents. D. Hansen Test., March 14, 2012 at 3:08 p.m. The four confronted Mr. Hixon with their findings. *Id.* at 3:08-3:09 p.m. Mr. Hixon, when confronted with the question of whether he was operating a "meth lab," denied it was "meth" but admitted he was making "speed". R. Hansen Test., March 14, 2012 at 1:43-1:46 p.m.; D. Hansen Test., March 14, 2012 at 3:08-3:09 p.m.; Hixon Test., March 14, 2012 at 12:10-12:11 p.m. He expressed his regret at violating the Debtors' trust, and he destroyed the lab equipment and removed it from the house. Hixon Test., March 14, 2012 at 12:10-12:11 p.m.

The Debtors continued their move out of the house in October apparently believing that the problem was solved. R. Hansen Test., March 14, 2012 at 1:44 p.m. They left Mr. Hixon and their grandson in the apartment due to their desire for their grandson to remain in his current elementary school until the end of the semester. R. Hansen Test., March 14, 2012, at 1:45-1:46

7

p.m. Mr. Hixon promised to finish cleaning the house and to finish the repairs the Debtors had

requested. *Id.* at 1:46-1:47 p.m.

On November 8, 2010, the Debtors returned to remove some additional items from the

residence. R. Hansen Test., March 14, 2012 at 1:47-1:48 p.m.; D. Hansen Test., March 14, 2012

at 3:10-3:11 p.m. While in the house, they noticed some blinds missing and some undercounter

lighting removed. Trial Ex. 12; R. Hansen Test., March 14, 2012 at 1:46-1:48 p.m.; D. Hansen

Test., March 14, 2012 at 3:11 p.m. They assumed Mr. Hixon had taken them. R. Hansen Test.,

March 14, 2012 at 1:46-1:48; D. Hansen Test., March 14, 2012 at 3:12 p.m.

Mr. Hansen called child protective services ("CPS") and reported that he suspected that

Mr. Hixon was doing "something unlawful" at the home where Nalin was living. R. Hansen

Test, March 14, 2012 at 1:48-1:50 p.m. Mr. Hansen may have informed CPS that the Debtors

had conducted "an intervention" with Mr. Hixon. *Id.*

On November 9, 2010 a representative of CPS and two Chattanooga police officers went

to the house. Trial Testimony of Officer Casey Cleveland ("Cleveland Test."), March 14, 2012

at 10:35-10:36 a.m.; 10:44 a.m. Mr. Hixon met them outside. *Id.* at 10:37 a.m.; 10:44 a.m.

Officer Cleveland testified that he smelled marijuana in the apartment, but he did not recall a

chemical odor. *Id.* at 10:40 a.m.; 10:44 a.m.; 10:46 a.m. His narrative does not mention chemical

odors. Trial Ex. 9; Cleveland Test., March 14, 2012 at 10:44 a.m. The case worker for CPS went

into the house to check on the presence of food for Nalin. Cleveland Test., March 14, 2012 at

10:39 a.m. The worker checked the cabinets for food and when she opened the kitchen cabinets

she found "large jars with a white liquid in them" that appeared to be components for making

methamphetamine. *Id.* at 10:39 a.m. The police officer immediately evacuated the building and

called the narcotics division. *Id.* Nalin was taken into protective custody.

When questioned by Detective Lancaster on the evening of November 9th, Mr. Hixon

admitted to having "cooked" meth approximately 20 to 25 times over the past year. Trial

Testimony of Detective Jeff Lancaster ("Lancaster Test."), March 14, 2012 at 10:50 a.m. Mr.

Hixon testified that after destroying the lab equipment for Mr. Hansen, he repurchased more.

Hixon Test., March 14, 2012 at 11:58-11:59 a.m. He explained that he had carefully hidden his

equipment in duffle bags and boxes made to look just like the rest of the storage area. Hixon

Test., March 14, 2012 at 12:07 p.m.

Mr. Hixon is currently serving a ten-year sentence at the Whiteville Correctional Facility

in Whiteville, TN for manufacturing methamphetamine and child neglect and abuse.

Following Mr. Hixon's arrest, the residence was quarantined pursuant to state law. The

notice indicated law enforcement authorities discovered a tier 3 laboratory engaged in the

manufacture of methamphetamine in the "under garage" room. Trial Ex. 7. No one was allowed

to inhabit the house until it was certified to be "Safe for Human Use." *Id.* The lab that was

confiscated included: marijuana, 18 gas generators, over 200 empty iodine bottles, approximately

54 filled iodine bottles, over 10,000 matches, beakers, ether, flasks, and sundry other items used

in the production and distribution of illegal narcotics. *See* Complaint, ¶ 14; Trial Exs 10, 11.

Within a few days, the Bank received the Notice of the Quarantine of the residence in November

of 2010. The Bank filed this adversary proceeding against the Debtors on December 22, 2010.

*See* [Doc. No. 1].

Law enforcement authorities placed the residence under an "order of quarantine" "due to risk of human exposure to the byproducts, chemicals, odors, vapors and fumes associated with the manufacture of methamphetamine." Complaint, ¶ 15.  However, the level of odors associated with the house is in controversy. For example, the real estate appraiser, who inspected the home in August of 2010, did not notice a smell. Trial Testimony of Karey Haisten-Matlock, March 14, 2012 at 2:54-2:55 p.m. The Debtors also did not notice a smell. D. Hansen Test., March 14, 2012 at 3:10 p.m.; R. Hansen Test., March 14, 2012 at 1:46 p.m. Officer Cleveland testified that although he noticed the smell of marijuana, he did not notice the chemical smell associated with methamphetamine. Cleveland Test., March 14, 10:40 a.m.; 10:44 a.m.; 10:46 a.m.; Trial Ex. 9. In addition, Hixon testified about the "small operation" that he cooked and how the sheetrock smell associated with the construction was more pervasive than any smell of methamphetamine. Hixon Test., March 14, 2012 at 12:09 p.m.

Despite the lack of a "tell tale" odor, there was significant contamination. The heating and air conditioning system, the basement, all the rooms except the Master Bedroom and another bedroom on the main floor, and the attic- all had levels of methamphetamine which exceeded the Tennessee health based standard. Trial Ex. 14. Over the next year, the Bank expended significant funds in remediation costs and legal fees. Trial Ex. 22.  Major portions of the house were gutted, leaving it only 59% complete.  The most recent appraisal also takes a 41% deduction because of the "methamphetamine lab stigma".  Trial Ex. 21, pp. 16, 23. That appraisal indicates that the house is worth $100,000.  *Id.*

Based on the tests that were conducted, the operation of the lab contaminated almost the entire structure. Many of the walls had to be removed, but not the Master Bedroom and another

bedroom on the main level. Nor was the new wall that was built in the basement in the summer
of 2010 so contaminated that it needed removal. Much of the flooring, the tile in some bathrooms
and the entire heating and air conditioning system were removed.

The Bank's evidence asks the court to infer from the Debtors' experience with Mr. Hixon
that they knew there was a meth lab operating and that their knowledge motivated them to
surrender the house, hoping to get it into the Bank's hands before the Bank discovered the
damage.  The Debtors contend that their decision to surrender the house had nothing to do with
the existence of a lab or their suspicions about drug use or manufacturing by Mr. Hixon.  Their
decision to surrender the house was based on the August 2010 appraised value and the lack of
equity to fund a 100% payoff to their creditors. Their decision to report their suspicions in
November was based on their concerns for their grandson, not the fact that confirmation had
been obtained. The court finds the Debtors to be credible witnesses and their explanations
supported by the evidence and corroborated by the testimony of the other witnesses.

The Bank's first asserted claim against the Debtors seeks dismissal of the Debtors'
bankruptcy case for cause pursuant to 11 U.S.C. § 1307(c).  It asserts that the Debtors materially
misrepresented the value and condition of the residence in their bankruptcy statements and
schedules, and thereby perpetrated a fraud on the court and the Bank. It contends the Debtors
allowed a methamphetamine laboratory to operate in their residence and hid such operations
from the Bank.  Complaint, ¶ 26.  The Bank's second cause of action asks this court to find the
deficiency claim resulting from the contamination of the residence to be nondischargeable
pursuant to 11 U.S.C. § 523(a)(6) and that the contamination was the result of willful and
malicious injury caused by the Debtors.  The third cause of action in the Complaint is a claim for

11

the enforcement of the Bank's note and deed of trust. Complaint, ¶ 39. The Bank also sought punitive damages in the amount of $250,000, as well as attorneys' fees and costs in its Complaint. *Id.* at p. 9, ¶¶ 8, 9. It withdrew its request for punitive damages at trial. It now seeks a judgment of $344,809.62, which reflects the difference in the deficiency it would have had before contamination of the residence compared to the deficiency it now anticipates, plus the remediation costs and attorney fees through February 28, 2012. Trial Ex. 22.

Two remediation treatments were required to make the residence suitable for human habitation. Those costs were $45,873.16. The Bank has also incurred $35,797.50 in legal fees. Trial Exs. 21, 22.

### B.      The Debtors' Counterclaim

The Debtors filed their answer to the Complaint on June 8, 2011. [Doc. No. 16, Answer ("Answer")]. In their Answer they filed a counterclaim against the Bank. At trial, Raymond Hansen testified that he contacted Steve Brown at ServPro after seeing ServPro's van in the driveway of the residence when Mr. Brown was preparing his bid for the Bank. R. Hansen Test., March 14, 2012 at 1:52 p.m. On February 7, 2011 Mr. Hansen received email correspondence dated February 3, 2011 forwarded from Mr. Bible indicating that Mr. Brown would be doing the remediation. *Id.* at 1:58-2:00 p.m.; 2:05 p.m.; Trial Exs. 25, 4; Trial Ex. F. Mr. Brown told Mr. Hansen that ServPro's bid had not actually been approved for First Tennessee Bank yet, but that he would get Mr. Hansen access to the house after he got clearance from the meth task force so that the Debtors could choose what personal property should be treated and removed. Trial Ex. F; R. Hansen Test., March 14, 2012 at 2:07-2:08 p.m. Mr. Hansen drove by the property in mid-February and saw that the house had been stripped and that there was no personal property

present. *Id.* Upon further inquiry, Mr. Hansen heard from Mr. Brown that the Bank had instructed him to dispose of the personal property. *Id.*

At trial, Mr. Brown testified that he never made any agreement with the Debtors regarding providing them with an opportunity to see and retrieve personal property. Trial Testimony of Steve Brown ("Brown Test."), March 14, 2012 at 11:19-11:21 a.m.; 11:28-11:29 a.m.; 11:35 a.m. He did admit he had given the Debtors a bid to clean the property of between $8000 and $10,000. *Id.* at 11:19 a.m.; 11:27 a.m. The Debtors understood that the proposed price was just to bring the property outside. R. Hansen Test., March 14, 2012 at 1:54 p.m. The counsel for the Bank sent letters and emails to the Debtors' counsel in December of 2010 and January and February of 2011 telling the Debtors they needed to hire their own hygienist to clean their property if they wanted it back. In these communications, the Bank acknowledged that it had no security interest or other interest in the Debtors' personal property and that it would accept no responsibility for storage or cleaning of the property. The Banks also stated that it would assume that the Debtors were abandoning the property if they did not send the name of their cleaning service to the Bank. *See* Trial Ex. 25. The court does not find that the Bank ever gave the Debtors a specific date when the personal property would be removed. The Bank offered no evidence that it was under any obligation to remediate the house by any date certain. From the evidence, it appears that the Bank determined the timing of removal of the property and gave the authorization to Mr. Brown to proceed. The Debtors allege that to complete its remediation of the property, the Bank, through its agents, disposed of their personal possessions in defiance of their ownership rights. [Doc. No. 32-1, Amended Answer, Counterclaim, p. 5, ¶¶ 4-8].

The Debtors have provided an exhibit that itemizes all of the property they claimed was destroyed.  *See* [Doc. No. 62-7, Ex. G]. The list includes various pieces of furniture, clothing, jewelry, and personal items such as a family Bible and photographs.  The Debtors admit that they failed to hire their own environmental specialist to clean the property or to tell them whether it could be cleaned. They also testified about their numerous efforts to make arrangements with Mr. Brown to recover their personal property. They relied on the representations made by Mr. Brown that he would tell them before the property was destroyed. He now denies he made any agreement with the Debtors to preserve their property for any certain period of time.  D. Hansen Test., March 14, 2012 at 3:28-3:29 p.m.; Brown Test., March 14, 2012 at 11:19-11:21 a.m.; 11:28-11:29 a.m.; 11:35 a.m. The Debtors admit that they were distracted in late 2010 and early 2011 by their efforts to regain custody of their grandson and that dealing with the issues involving their home was "secondary."  D. Hansen Test., March 14, 2012 at 3:28-3:30 p.m. Despite their distracted state, the court finds no evidence that the Debtors ever intended to abandon their personal property, only that they were having trouble finding the funds to pay for the remediation.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding.  The Plaintiff's action regarding the dischargeability of particular debts is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(I), (J). With respect to any other causes of action, the parties have consented to jurisdiction. [Doc. No. 30, Scheduling Order].

III.     **Analysis**

A.     **First Tennessee Bank's Claims**

1.     **Dismissal of Case for Cause Pursuant to 11 U.S.C. § 1307(c)**

11 U.S.C. § 1307(c) states in part:

> Except as provided in subsection (f) of this section, on request of a party in
> interest or the United States trustee and after notice and a hearing, the court may
> convert a case under this chapter to a case under chapter 7 of this title, or may
> dismiss a case under this chapter, whichever is in the best interests of creditors
> and the estate, for cause, . . .

11 U.S.C. § 1307(c). The provision then contains a nonexclusive list of examples of "cause,"

such as "material default by the debtor with respect to a term of a confirmed plan." 11 U.S.C. §

1307(c)(6).

   In 2002 the Sixth Circuit addressed the dismissal-for-cause provision of 11 U.S.C. §

1307(c), noting the following:

> Despite the fact that there are no such reported decisions in this circuit, there is
> abundant authority for the notion that a bankruptcy court has the power to dismiss
> a Chapter 13 petition upon a finding that the debtor did not bring it in good faith.
> Most courts ascribe the basis for such a dismissal to 11 U.S.C. § 1307(c), which–
> although it does not expressly address good faith– permits a bankruptcy court to
> dismiss a Chapter 13 petition "for cause." The key inquiry in such cases is
> whether the debtor is seeking to abuse the bankruptcy process.

*In re Alt*, 305 F.3d 413, 418-19 (6th Cir. 2002) (citing *In re Banks*, 267 F.3d 875, 876 (8th Cir.

2001); *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996); *Eisen v. Curry (In re Eisen)*, 14 F.3d 469

(9th Cir. 1994); *Gier v. Farmers State Bank of Lucas (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir.

1993); *In re Love*, 957 F.2d 1350 (7th Cir. 1992); 1 KEITH M. LUNDIN, CHAPTER 13

BANKRUPTCY § 5-2 (3d ed. 2000)); *see also, Industrial Ins. Servs., Inc. v. Zick (In re Zick)*,

931 F.2d 1124, 1127 (6th Cir. 1991) (noting that "[w]e are persuaded that there is good authority

15

for the principle that lack of good faith is a valid basis of decision in a 'for cause' dismissal by a

bankruptcy court"). In the Sixth Circuit consideration of whether good faith exists requires an

examination of the "'totality of the circumstances,'" including such factors as "'the sincerity with

which the debtor has petitioned for relief under Chapter 13'" and "'the amount of payment

offered by debtor as indicative of the debtor's sincerity to repay the debt.'" *In re Alt*, 305 F.3d at

419 (quoting *Society Nat'l Bank v. Barrett (In re Barrett),* 964 F.2d 588, 591 (6th Cir. 1992)).

Other factors to consider include:

> the nature of the debt; how the debt arose; the timing of the petition; whether the
> debt would be dischargeable in chapter 7; the debtor's motive in filing; how the
> debtor's actions affected creditors; the debtor's treatment of creditors before and
> after the filing; and whether the debtor has been forthcoming with the court and
> creditors.

*In re Grischkan*, 320 B.R. 654, 659 (Bankr. N.D. Ohio 2005) (citing *In re Alt*, 305 F.3d at 419-

20).

Good faith is further a "fact-specific" and "flexible determination." *In re Alt*, 305 F.3d at

419. In *In re Alt* the Sixth Circuit explained that:

> [w]here present, the factors set forth by this court in the plan confirmation context
> are properly considered as well. . . . However, given the more severe
> consequences, the law also recognizes that 'the bankruptcy court should be more
> reluctant to dismiss a petition under Section 1307(c) for lack of good faith than to
> reject a plan for lack of good faith under Section 1325(a).

305 F.3d at 420 (quoting *Love*, 957 F.2d at 1356). The party seeking dismissal of the case bears

the burden of demonstrating a lack of good faith by a preponderance of the evidence. *In re Alt*,

305 F.3d at 420; *Sicherman v. Warner (In re Werner)*, No. 11-1032, 2011 WL 6140856, at *3

(Bankr. N.D. Ohio Dec. 9, 2011).

16

Factors pertaining to good faith in the plan confirmation context, which also might

overlap with the Section 1307(c) good faith concept include:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn and likelihood of future
> increase in income;
> (3) the probable or expected duration of the plan;
> (4) the accuracy of the plan's statements of the debts, expenses and percentage
> repayment of unsecured debt and whether any inaccuracies are an attempt to
> mislead the court;
> (5) the extent of preferential treatment between classes of creditors;
> (6) the extent to which secured claims are modified;
> (7) the type of debt sought to be discharged and whether any such debt is
> nondischargeable in Chapter 7;
> (8) the existence of special circumstances such as inordinate medical expenses;
> (9) the frequency with which the debtor has sought relief under the Bankruptcy
> Reform Act;
> (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;
> (11) the burden which the plan's administration would place upon the trustee;
> and,
> (12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*In re Caldwell*, 895 F.2d 1123, 1126-27 (6th Cir. 1990); *see also In re Griffith*, 203 B.R. 422, 424

(Bankr. N.D. Ohio 1996).

The court concludes that the Bank has failed to sustain its burden of proving that the

Debtors' bankruptcy case should be dismissed for cause. There is no evidence in the record

indicating that the Debtors did filed their second amended plan in bad faith. The record

demonstrates that as of the date of the filing of the second amended plan and the subsequent 341

meeting, the Debtors were not aware of any methamphetamine contamination. The record is also

clear that the first occasion on which the Debtors learned of Mr. Hixon's illegal activities in the

residence occurred on October 16, 2010. Both Mr. Hansen, Mrs. Hansen, and Mr. Hixon all

described the "intervention" that took place on that date. The parties also all consistently testified

that Mr. Hixon denied making methamphetamine, but admitted to making "speed," and that Mr.

Hixon agreed that he would dispose of all the drug-making paraphernalia at that time. Mr. Hixon testified that he did, in fact, dispose of the equipment.  It was not until November 8, 2010 that the Debtors returned to the residence and had reason to suspect that Mr. Hixon was engaged in some inappropriate activity as evidenced by the removal of light fixtures and custom blinds from the residence. Mrs. Hansen sent an email that next afternoon indicating her concern that he was damaging the house by removing fixtures. Trial Ex. 12. On November 9th, the Debtors contacted CPS, and a CPS worker, along with Chattanooga police officers entered the house and arrested Mr. Hixon. There was no evidence at trial contradicting the Debtors' version of the events at issue, nor is there any indication in the record that they had knowledge of the methamphetamine production in the residence prior to October 16, 2010 at the very earliest. The record also indicates that they believed that the problem had been solved until November 8, 2010. The Debtors' claims of ignorance are supported by the testimony of the appraiser who inspected the property in August of 2010 and found no reason to believe that there was any damage to the residence which would have affected the value.

With respect to the other factors to be considered in a good faith analysis, the Debtors are proposing in their Plan to pay all of their disposable income for five years. They are making substantial payments of $1465 a month. They proposed to give up the house and to allow a deficiency claim to the Bank. There is no evidence of inaccuracies or irregularities in the schedules or the Debtors' conduct, other than the value provided for the residence. The court finds the value estimate was made in good faith, without knowledge of the damage which may have been caused by earlier "cooks" by Mr. Hixon. The court finds the Debtors' testimony credible and their motivation for filing the Chapter 13 to be sincere and in good faith. The

18

circumstances of the damage to the residence are unfortunate. However, the court does not find

the Debtors' filing to have been in bad faith, nor does it find the confirmation of the plan,

without objection by the Bank at a time the Debtors were unaware of the extent of the damage, to

be in bad faith.   Based on the evidence at trial, the court concludes that the Bank has not

demonstrated that the Debtors' bankruptcy case should be dismissed for cause pursuant to 11

U.S.C. § 1307(c). This claim will therefore be DENIED.

**2.      Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6)**

11 U.S.C. § 1328 provides for discharge from debt unless excepted from discharge

pursuant to 11 U.S.C. § 523.  11 U.S.C. § 1328(a)(2).  11 U.S.C. §§ 523(a)(6) states in relevant

part:

> A discharge under section . . . 1328(b) of this title does not discharge an
> individual debtor from any debt – . . .
>
> > (6) for willful and malicious injury by the debtor to another entity
> > or to the property of another entity . . . .

11 U.S.C. §§ 523(a)(6).   The creditor must prove by a preponderance of the evidence that a debt

is nondischargeable under 11 U.S.C. § 523.  *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct.

654, 659 (1991).  Exceptions to discharge are narrowly construed in the debtor's favor.  *See*

*Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).    In this

case the Plaintiff must demonstrate both willful and malicious behavior by a preponderance of

the evidence at trial.

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

analyzing federal law.  *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01

(Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264

19

B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388 (Bankr. N.D. Ohio 1999)).  11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and* malicious is nondischargeable.  *See* 11 U.S.C. § 523(a)(6).  "[T]he judgment must be for an injury that is both willful and malicious.  The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999).  The U.S. Supreme Court has addressed the meaning of "willful" within the context of § 523(a)(6).  *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998).  As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate."  As such, only acts done with the intent to cause injury – and not merely acts done intentionally – can cause willful and malicious injury.  The Court explained its holding by discussing the importance of context:
>
> > The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."  Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury."  Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)."  *In re Markowitz*, 190 F.3d at 464.

In this case, there is no evidence that the Debtors ever manufactured drugs in the residence. There is no evidence that they ever directed, condoned or benefitted from Mr. Hixon's activities. There is also no evidence that any of the Bank's damages arose from any other activity other than the manufacture of methamphetamine. The only acts by the Debtors which could conceivably have been related to the damages were their decision to allow Mr. Hixon to reside in the residence with his son, their grandson, and then their decision to allow him to remain in the house after they moved out.

Proof of willful behavior must often be demonstrated through the use of circumstantial evidence. *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id.* The proof in this case does not show that the Debtors knew that these decisions would cause injury to the residence. They only invited Mr. Hixson to live with them after ten months of exemplary behavior. They talked to his parole officer after he moved in within them, and the officer also indicated that Mr. Hixon was not violating any of the conditions of his parole. He was regularly being tested for drugs. He had a job. He was assisting the Debtors with yard work and maintenance on the residence, activities which preserved the value of the residence. Until October 16, 2010, there was no evidence that any nefarious activity was going on at the residence. When the lab was discovered, they took immediate and strong action to stop the activity. When they moved out after receiving the promise that Mr. Hixon had disposed of the lab, they left Mr. Hixon to finish repairs and to care for their grandson. The court does not believe that they would have left their grandson with Mr.

Hixon had they believed that there was any dangerous activity occurring at the house. The court does not find that the act of bringing Mr. Hixon into the residence initially or the act of leaving him in the house with his son were acts taken with the intention of injuring the rights of the Bank.

As to the element of malice, a malicious injury occurs "when a person acts in conscious disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing *Gonzalez v. Moffitt (In re Moffitt)*, 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of maliciousness does not require a determination of ill-will or specific intent. *See In re Trantham*, 304 B.R. at 308. However, malice requires the finding of a level of conduct beyond negligent or reckless behavior. *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S.Ct. 974. A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*, 430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991), abrogated on other grounds as explained in *In re Slosberg*, 225 B.R. 9, 18 n.10 (Bankr. D. Me. 1998)). As previously discussed, the court does not find that leaving Mr. Hixon in the residence was a wrongful act, undertaken intentionally to harm the Bank, without just cause or excuse. The Debtors' perceptions of Mr. Hixon's promises and his concern for his own son may have been mistaken, but those perceptions were based on months of conduct in which Mr. Hixon appeared

to have been behaving in a legal and responsible manner. Further, Mr. Hixon managed to operate

without detection by the Debtors, his parole officer and an appraiser who inspected the property.

In *National Sign and Signal v. Livingston* the district court explained that the § 523(a)(6)

exception applies where the injury invades a creditor's legal rights.  422 B.R. 645, 653 (W.D.

Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)).  The district

court quoted the Sixth Circuit decision in *In re Best* noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of
> the legal rights of another, because the word 'injury' usually connotes legal injury
> (*injuria*) in the technical sense, not simply harm to a person."  The conduct "must
> be more culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies, as distinguished from . . . legal rights.  Moreover,
> knowledge that legal rights are being violated is insufficient to establish malice . .
> . .

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6).  The court in *Livingston*

noted that there are three elements that a creditor must demonstrate to state a claim under §

523(a)(6): "(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its

legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's

conduct."  422 B.R. at 653 (citing *CMEA Title Agency v. Little (In re Little)*, 335 B.R. 376, 383

(Bankr. N.D. Ohio 2005)).  Even if the court were to determine that leaving Mr. Hixon in the

house without the Debtors was reckless behavior given their suspicions, recklessness would not

be sufficient for the court to find the required willfulness and malice.

The Bank argues that even an omission or a failure to act can constitute willful and

malicious behavior. It relies on *Petralia v. Jercich (In re Jercich)* in support of its position. 238

F.3d 1202 (9th Cir. 2001). In that case the Ninth Circuit found that an employer's failure to pay

his employee's wages amounted to willful and malicious behavior that was excepted from

discharge. *Id.* at 1208-09. The employer in that case decided to spend the employee's wages on personal investments rather than pay the employee. *Id.* at 1204. The court does not find the facts in that case to be analogous to this case. In *Petralia*, the employer "willfully" chose not to pay the employee's wages. *Id.* at 1207. In contrast, in *Davis v. Vestal (In re Vestal)* also cited by the Bank, the court concluded that a debtor's failure to return voucher payments to which he was not entitled, where there was no evidence indicating the debtor was aware he was receiving payments to which he was not entitled, constituted a negligent omission and not willful and malicious behavior. 256 B.R. 326 (Bankr. M.D. Fla. 2000). The court finds the Debtors' failure to remove Mr. Hixon from the house in order to protect the residence to be, at most negligent, but not willful and malicious behavior.

In one case in this Circuit that bears some similarity to the issues present in this adversary proceeding, the bankruptcy court addressed whether the acts of the defendant debtors were willful and malicious where the debtors' children and their friends damaged the plaintiff landlord's property. *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826 (Bankr. N.D. Ohio 2000). In that case the debtors' children and their friends caused $3,500 worth of damage to the plaintiff's rental property by spraypainting walls, knocking holes in walls, and tearing doors off of hinges. *Id.* at 829. The court first noted that nondischargeability pursuant to § 523(a)(6) requires willful and malicious behavior by the *debtor. Id.* at 830. The court explained:

> . . . under the plain meaning of § 523(a)(6), it must be the debtor who acts in both a willful and malicious manner in causing an injury to another entity or the property of another entity. As a result of this requirement, it has been universally held that a person's willful and malicious actions cannot be imputed to another person for the purpose of holding that debt nondischargeable under § 523(a)(6). Moreover, this principle has been specifically applied so that willful and malicious actions undertaken by a child are not imputed to the child's parents. Thus, parents who are merely negligent in supervising their children are still

24

> entitled to have any liability arising from such negligent supervision discharged in bankruptcy.
>
> Notwithstanding this principle, there is no direct requirement under § 523(a)(6) that a debtor actually be the entity which physically occasions the actual damages to the person or property. Thus, any debtor who seeks or encourages another person to commit a willful and malicious act would not, for purposes of § 523(a)(6), be entitled to have any liability arising therefrom discharged in bankruptcy. Further, the types of encouragement which may lead to a finding of nondischargeability under § 523(a)(6) can range from overt encouragement to simply an omission, if such an omission was calculated by the debtor in a willful and malicious manner to cause injury.

*Id.* at 830 (citations omitted). In applying the described principles to the case before it, the court examined the relevant circumstantial evidence and concluded that the debt was nondischargeable, noting that: the children flagrantly damaged the plaintiff's property on numerous occasions; the debtors did not discipline the children seriously enough; the debtors failed to repair the damage or notify the plaintiff in violation of Ohio law; and the damage occurred when the relationship between the parties was unraveling. *Id.* at 831. The court found that the collective evidence, as well as the lack of debtors' remorse and their "complete apathy" "both influenced and encouraged their children and their friends to commit acts of vandalism against the house, and that the end result was intended by the" debtors. *Id.*

The court concludes that the behavior of the Debtors is easily distinguished from the behavior of the debtors at issue in *In re Sintobin*. 253 B.R. 826. In that case the debtors and their landlord had a deteriorating relationship; the debtors' children damaged the landlord's property on several occasions and the debtors did not discipline them seriously enough; and the debtors failed to repair the property or notify the landlord in violation of state law. *Id.* at 831.

In contrast, in this case, the Debtors first had notice of Mr. Hixon's behavior on October 16, 2010, after they filed their second amended plan on September 27, 2010 and after the 341

25

meeting held on October 13, 2010. [Bankr. Case No. 10-13181, Doc. Nos. 22, 23, 26].  At that time, Mr. Hixon vehemently denied making methamphetamine in the home, but rather confessed to creating "speed." The Debtors testified that they did not understand that "speed" was another term for methamphetamine. Regardless of the type of drug being made, they required that the actions stop. They believed Mr. Hixon when he said he would dispose of the drug-manufacturing equipment and discontinue his drug operation. Mr. Hixon testified that he did until they moved out. There is no evidence to the contrary in the record.

It was not until the Debtors returned to the home on November 8, 2010 that they realized that Mr. Hixon was removing fixtures. They then surmised that he was pawning the fixtures to obtain drug money. The very next day, CPS and the Chattanooga Police Department raided the house and arrested Mr. Hixon. Even at the time they called, they had no actual knowledge that there had been drugs manufactured in the house for approximately a year or that the contamination would require over 50% of the house to be gutted. Even the professional cleaner thought the house was fit and failed the testing before the Bank employed a second cleaner and obtained the Certificate of Fitness almost a year after the remediation began. Trial Exs. 16,19, and 23.

The evidence in *In re Sintobin*, including such factors as the debtors' lack of remorse when testifying at trial, suggested that the debtors were willful and malicious in encouraging their children to destroy the landlord's property. 253 B.R. at 831. In this case there is no evidence that indicates the Debtors encouraged or supported Mr. Hixon's activities in any way. To the contrary, they maintained the home and made efforts to ensure that the home was not stripped before the foreclosure. They did not deceive the Bank in their bankruptcy plans, nor did

26

they understand there was any damage until after the police raided the home and discovered a the

methamphetamine laboratory. There is no evidence that they were aware of the scope of the

damage until the remediation testing was conducted.

The court concludes that the Bank has failed to sustain its burden of proof regarding

evidence of the Debtors' willful and malicious behavior. The evidence at trial did not indicate

that the Debtors engaged in any conduct required for a finding of malice.  *See In re Wierenga*,

431 B.R. at 185. The Bank's request that the deficiency arising from the reduction in the value of

the residence and the costs of remediation be determined to be nondischargeable debt pursuant to

11 U.S.C. § 523(a)(6) will be DENIED.

**3.      Enforcement of Deed of Trust**

In its Complaint the Bank seeks enforcement of the Deed of Trust although it did not

argue for any special relief related to this count at trial. It asserts that the Note on the loan to the

Debtors secured by the home is "in default by reason of non-payment as well as other breaches

of contract and said indebtedness has been accelerated and is presently due and payable in full"

and that "the Defendants are not due any further credits or offsets and the Defendants are liable

for all amounts due and owing." Complaint, ¶¶ 36-37. It further asserts that it is entitled to

recover its attorneys' fees and costs in accordance with the Note and Deed of Trust.

The Balloon Note secured by the Collateral states the following:

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I
will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if
I do not pay the overdue amount by a certain date, the Note Holder may require
me to pay immediately the full amount of Principal which has not been paid and

all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

[Doc. No. 1-2, p. 2, ¶ 6; Trial Exhibit 1].

In addition, the Deed of Trust states:

Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

[Doc. No. 60-1, Trial Ex. 2].

The Bank contends that the Debtors breached the Deed of Trust by failing to notify it of

the hazard to the value of the home and by failing to preserve the home's value. However, as

discussed *supra*, the evidence at trial indicates that the Debtors did not understand the scope of

the damage until *after* November 9, 2010 when the police discovered the working

28

methamphetamine lab. At that point, the court had granted the Bank's motion for relief from the

stay, and the court had confirmed the second amended bankruptcy plan. [Bankr. Case No. 10-

13181, Doc. Nos. 27, 29]. Therefore, the court concludes that the Debtors did not know to inform

the Bank of any damage to the residence prior to the Bank's receiving relief from the automatic

stay. In essence, the evidence indicates that the Debtors understood the magnitude of the damage

at the same time the Bank did, upon receipt of the Notice of Quarantine from the State of

Tennessee. The court finds no claim exists for failure to notify.

The court does find that the Debtors are responsible for the damages to the residence

under the preservation provision. To the extent that the Bank is seeking to have its expenses for

remediation and attorney's fees and the loss of value due to the remediation and "meth lab

stigma" allowed as part of its claim, the court will GRANT this claim and allow those damages

as part of the Bank's unsecured deficiency claim.

### 5.      Post-Petition Claims for Remediation Costs and Attorneys' Fees

The Bank also argued for the first time in its pretrial brief that its costs for remediating

the home and its attorney's fees are not dischargeable because they are unscheduled post-petition

debts. In *In re Cleveland* the bankruptcy court addressed whether a post-petition proof of claim

filed by a mortgage holder for escrow payments which accrued post-petition and which it had

made for the debtor were dischargeable. 349 B.R. 522 (Bankr. E.D. Tenn. 2006). In that case the

plan did not provide for post-petition claims, as is the case in the Debtors' plan. *Id.* at 527. The

court needed to determine when the claim actually arose – post-petition as argued by the

mortgage holder– or pre-petition. *Id.* at 528. It noted that courts have used three approaches

when determining when a claim arises: "(1) the accrued state law claim approach; (2) the

conduct approach; and (3) pre-petition relationship approach." *Id.*

 After reviewing the case law adopting the three approaches, the bankruptcy court adopted

the third approach, the pre-petition relationship/ "fair contemplation" approach. *Id.* at 531. It

defined the question in the following way:

> [a] claim is a pre-petition claim within the scope of § 101(5)(A) if there was a
> relationship, existing pre-petition, between the debtor and the creditor such that
> the creditor could fairly contemplate the possibility of a claim against the debtor's
> bankruptcy estate at the time that the bankruptcy petition was filed.

*Id.*

 The court then determined that because the mortgage holder always had a right to

payment of the debtor's escrow payments, its post-petition amounts were really based on a pre-

petition right to payment. *Id.* The court found that "the escrow payments advanced by [the

mortgage holder] after the Debtor commenced his bankruptcy case are, in fact, pre-petition

obligations that matured post-petition, but nonetheless arose pre-petition such that they are

covered within the definition of claim set forth in § 101(5)(A)." *Id.* at 533. It further determined

that the claim was disallowed because the mortgage holder was bound by the terms of the

confirmed plan which did not include the escrow payments. *Id.* at 534. The court also determined

that "[a]doption of the 'fairly contemplated test" was the best way to balance the Code's fresh

start policy, on the one hand, and its measured hostility to fraud, on the other." *Id.* at 530.

 In *In re Huffy Corp.* the court addressed "the proper characterization of [the plaintiff's]

claim for indemnification against [the debtor] as a prepetition claim discharged in [the debtor's]

bankruptcy cases or a post-confirmation claim that is not discharged . . ." *In re Huffy Corp.*, 424

B.R. 295, 297 (Bankr. S.D. Ohio 2010). There, the plaintiff's claim was based on the pre-petition

sale of a product that the debtor sold at one of the plaintiff's stores pursuant to a pre-petition

agreement that included an indemnification provision. *Id.* The tort liability relating to the faulty

manufacturing of the debtor's product did not occur until post-petition, and the debtor and the

plaintiff did not receive notice of the injury until after confirmation of the debtor's plan. *Id.* As in

*In re Cleveland*, the court noted that the Sixth Circuit has not selected one of the approaches, and

the court reviewed the three approaches to determining accrual of a claim. It determined that

under any of the three approaches, the plaintiff's claim was a pre-petition claim. *Id.* at 305. The

court found that the manufacturing and sale of the defective product, as well as the

indemnification agreement all occurred pre-petition.  It noted that "courts facing similar facts

have almost universally held that a contractual right to indemnification is a prepetition

contingent claim if the contract was executed before the bankruptcy filing." *Id.* at 305.

The Debtors and the Bank had a prepetition relationship. The Bank is relying on the

provisions of its deed of trust executed by the Debtors prepetition to require the Debtors to

preserve the property. The Bank relies on the deed of trust to charge the Debtors for any

expenses the Bank incurs if the Debtors fail to comply. Trial Ex. 2, p. 7, ¶¶ 7, 9 (deed of trust

contemplates that any expenses of the Bank taken to protect its rights to preservation "shall

become additional debt of Borrower secured by" the deed of trust).  Therefore, the Bank

contemplated that there was a risk of a substantial, if not complete, loss of its property. The deed

of trust gives the Bank an option of not rebuilding if there is a determination that restoration is

not economically feasible. *Id.* at ¶ 5. The claims arising from remediation were within the fair

contemplation of the parties. Further, the court finds that the provision allowing the Bank to

charge for its expenses is similar to the indemnification provisions which are almost

31

"universally" held to be pre-petition claims. *See In re Huffy Corp.*, 424 B.R. at 305. In this case, the contingent claim has matured and been liquidated.

Finally, because the court has found that the claim did not arise as a result of fraud or malicious or willful injury by the Debtors, the court need not consider whether the application of the fair contemplation test in this case fails to balance fairly the policies in favor of a fresh start against those of preventing fraud.

### B.   Debtors' Counterclaims

The Debtors' amended counterclaim seeks damages for conversion and destruction of property.  Under Tennessee law:

> [c]onversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights.  Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights.

> Property may be converted in three ways.  First, a person may personally dispossess another of tangible personalty.  Second, a person may dispossess another of tangible property through the active use of an agent.  Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for "receiving a chattel."

*H & M Enterprises, Inc. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. April 17, 2002) (citing *Kinnard v. Shoney's Inc.*, 100 F.Supp.2d 781, 797 (M.D. Tenn. 2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)) (other citations omitted); *see also, Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008).  In *Kinnard* the court explained that "[i]n order to establish conversion, the plaintiffs must show that 'the defendant . . . had an intent to exercise dominion and control over

the property that is in fact inconsistent with the plaintiffs' rights, and did so.'" 100 F.Supp.2d at

797-98 (citing *Oldham*, 569 S.W.2d at 836).

The proof at trial demonstrated that the Bank repeatedly informed the Debtors, through

their counsel, that they needed to make arrangements to have the personal property that they

wanted to keep cleaned. The Bank had no legal right to release the property to the Debtors after

the house and its contents had been quarantined. However, the Bank has failed to provide the

court with any authority that it had the legal right to direct its agent to destroy the personal

property.  ServPro was retained by the Bank. Mr. Brown was the agent who worked with the

Bank on this matter. Mr. Hansen testified that Mr. Brown told him he would let him know before

anything was destroyed. Mr. Brown failed to do so. When Mr. Hansen confronted Mr. Brown

about Mr. Brown's promise, Mr. Brown responded that the Bank told him that there was no time

to wait.

The Bank attempts to create its authority to direct the destruction of the personal property

through a series of letters and emails. The letters from the Bank's attorney to the Debtors'

attorney began in December of 2010. In that letter, the Bank acknowledges that it "does not have

a security interest or ownership interest in any of [the Debtors'] personal property. Trial Ex. 25 at

1.  The Bank's attorney further states that if he does not have the name of the party the Debtors

selected to do the cleaning, he "will assume that [the Debtors are] abandoning it…." *Id.*  In

January, the Bank's attorney wrote that the Bank denied that it would pay for any storage or

testing of the personal property. He assumed that the property would be destroyed and stated that

the Bank disavowed any responsibility for that destruction. *Id.* at p. 3. The final communication

was sent on February 3, 2011 regarding how the Debtors should take steps to preserve any

33

personal property contained in their residence. *Id.* at pp. 4-6. It did not give a specific date for the destruction of the personal property.

The Debtors did contact the individual whom the Bank instructed them to contact, Steve Brown with ServPro, in an attempt to coordinate retrieval of certain personal items. The Debtors had been in contact with Mr. Brown prior to this time. Mr. Hansen had spotted his van at the house when Mr. Brown was preparing his bid and had stayed in touch with him. They had been negotiating the cost of the remediation and had even discussed specific items for salvage. The Debtors admit they never reached an agreement with Mr. Brown, but Mr. Hansen believed that he would have an additional opportunity to do so before the final date for destruction was selected. There is no evidence that the Debtors gave any indication that they wanted to abandon the personal property, only that they were having trouble affording what Mr. Brown wanted to charge. At trial Mr. Hansen testified that the Bank had instructed Mr. Brown to dispose of the personal property. R. Hansen Test., March 14, 2012 at 2:07-2:08 p.m.

No witness from the Bank confirmed or denied this statement. The letter which the Debtors admit receiving, clearly did not make any promises with respect to the protection of the personal property and urged the Debtors to employ someone to clean the property that they wanted to keep. Trial Ex. 25. However, the letters also clearly indicate that the Bank did not have any right to the personal property and that it was aware that the Debtors wanted information about who was cleaning the property for the Bank so that they could contact him. Mr. Brown was certainly aware of the Debtors' continued interest in their property, and he took his instructions from the Bank about proceeding.

34

The Debtors admit they never hired anyone to remediate the property and had only hoped that they could work something out with Mr. Brown. The Bank argues that this failure amounts to abandonment. The definition of abandonment is the "voluntary relinquishment [of property] by its owner or holder, with the intention of terminating his or her ownership, possession, and control, and without vesting ownership in any other person. 1 C.J.S., *Abandonment* § 1 (2011)." *Jefferson County v. Smith*, No. E2009-02674-COA-R3-CV, 2011 WL 3062010, at *11 (Tenn. Ct. App. July 26, 2011). The burden of proving abandonment is upon the party asserting it. The abandonment must be established by clear and unequivocal evidence of decisive and conclusive acts. *Jacoway v. Palmer*, 753 S.W.2d 675, 679 (Tenn. Ct. App. 1987). Here there was no intent and no "decisive and conclusive act" by the Debtors to abandon their personal property. It appears the Bank tired of waiting and instructed its agent to proceed with the cleaning and to destroy whatever needed to be destroyed to do so. This act was an intentional act in violation of the Debtors' interest in the personal property for the Bank's benefit. The court finds that the Debtors have proven the elements of conversion, but they must also prove their damages.

The Hansens seek the market or actual value of the property they allege was converted. At trial the evidence presented by the Debtors demonstrated a value of $6000 for the personal property that could be valued, although a substantial portion of the property destroyed had no market value, only significant personal value. Examples of these items included family photographs and memorabilia from their children's early years. These values did not include any reduction for contamination.

To the extent that the items included draperies, wooden blinds or a comforter set, Mr. Brown testified that porous materials generally could not be cleaned. He also testified that some

nonporous items like a pinball machine or a computer could be so contaminated internally as not

to be salvageable.  The Debtors offered no proof that the items on their list were capable of

remediation or whether the cost of remediate exceeded the value of the items.  To the extent that

they were destroyed as a result of the contamination, the damages the Debtors sustained were not

caused by the Bank's conversion. It is the Debtors' burden to prove their damages. *See e.g., In re*

*Clark*, 206 B.R. 439, 441 (Bankr. W.D. Ky. 1996) (citing 18 Am.Jur.2d CONVERSION § 2,

pages 146-47 (2d ed. 1996)). Since they have not carried their burden as to the damages, the

court will DENY the Debtors' counterclaim.

### IV.    Conclusion

The Bank's request for revocation of the confirmation order will be DENIED. The court

finds that the Debtors were unaware of the operation of the methamphetamine lab in their

residence and that their motivation to surrender the residence was not motivated by a desire to

return it before the damage caused by the methamphetamine lab was discovered.

The court finds that there was significant damage done to the residence, but that it was

not done by the Debtors. Further, the court finds there was no intention on the part of the Debtors

to allow Mr. Hixon to injure the property; therefore, the Bank's request to deny the

dischargeability of the losses caused by manufacture of methamphetamine in the residence will

be DENIED.

The court finds that the Bank does have a claim for damages in the amount of

$344,809.62, reduced by any amount which the Bank recovers in excess of $100,000 from the

foreclosure sale. The Bank's claim is a prepetition claim which may be filed in the Chapter 13

case and which may be discharged by completion of the Debtors' plan.

36

Finally, the Bank authorized the destruction of the Debtors' personal property, but the Debtors have failed to prove the value of that property after contamination. The Debtors' counterclaim will be DENIED.

A separate order will enter.

# # #